# Bertha Welch, Appellee, v. City of Chicago, Appellant.

## Gen. No. 29,349.

1. MUNICIPAL CORPORATIONS—*sufficiency of declaration as to giving statutory notice of injury.* An allegation in a declaration against a city for personal injuries sufficiently alleged the giving of the notice to the city required by section 2, ch. 70, ¶ 7, Cahill's St. 1923, p. 1917, where it stated that plaintiff caused to be filed in the office of the city attorney and also in the office of the city clerk written notices of the injury, containing a statement of the hour, date and year on which the accident occurred, the place of the accident and the name of the physician attending plaintiff.

2. LIMITATIONS OF ACTIONS—*sufficiency of plea of limitations to amended declaration.* A plea of the statute of limitations that the causes of action in the "amended declaration mentioned did not, nor did any or either of them accrue to the plaintiff at any time within one year next before the commencement of this suit" did not raise the question as to whether the amended declaration stated a new cause of action.

3. MUNICIPAL CORPORATIONS—*sufficiency of notice to city of personal injuries.* A notice of injury given to a city sufficiently stated that plaintiff was the injured person where it said that a cause of action accrued to her and gave the name and address of her attending physician.

4. HIGHWAYS AND STREETS—*right of pedestrian to assume safe condition of crosswalk.* A pedestrian in crossing a street at a crosswalk on a busy corner of a city is entitled to assume that the area of the crosswalk on which she is walking is in a reasonably safe condition and there is no special obligation upon her to look particularly at the surface of the street.

5. HIGHWAYS AND STREETS—*when verdict not against manifest weight of evidence.* A verdict for plaintiff in an action for injuries received in falling on a crosswalk in defendant city cannot be said to be against the manifest weight of evidence where there was credible evidence that, in filling a hole dug to repair a gas main, there had been left a depression some inches deep with a jagged edge on one side into which plaintiff stepped and fell and that the accident occurred at one of the busiest street corners in the world at a time when it was crowded with people.

6. INSTRUCTIONS—*what does not amount to oral instruction.* There was not such error as to require a reversal under the statute prohibiting a trial judge from instructing the jury except in writing when, in response to an objection that a certain remark

· Welch v. City of Chicago, 236 Ill. App. 520.

to the jury in argument of counsel was contrary to the evidence, the judge stated orally to the jury that they should base their verdict upon the evidence introduced by the witnesses and the documentary evidence.

7. DAMAGES—*excessiveness of verdict.* A verdict for $18,000 for personal injuries received in falling on a defective crosswalk cannot be said to be so excessive as to indicate passion and prejudice where, prior to the accident, plaintiff was a healthy married woman and the injury was an oblique fracture of the neck of the femur of the right leg for which she was treated two weeks in a hospital and then was under a doctor's care at home over five months and was obliged to use crutches for several years and that there is a degeneration of the entire head of the femur so that the leg has been shortened two inches and is growing shorter and she is unable to work because of pain or to put enough weight on the foot to walk without crutches.

8. HIGHWAYS AND STREETS—*when instruction in injuries case not erroneous as assuming crosswalk unsafe.* An instruction in an action for injuries received in a fall on a crosswalk was not objectionable as assuming that the crosswalk was unsafe as a matter of fact in stating that plaintiff had a right to presume it was reasonably safe "unless it further appears from the evidence that the condition of said street and crosswalk was known to or discoverable by the plaintiff by the exercise of ordinary care."

9. HIGHWAYS AND STREETS—*propriety of instruction as to injuries from "hole" in pavement.* An instruction in an action for injuries resulting from a fall in a depression in a crosswalk was not erroneous in using the word "hole" though "depression" may have been more apt.

10. HIGHWAYS AND STREETS—*propriety of instruction as to liability of city for street defect caused by gas company.* An instruction that, though a gas company dug and refilled the hole at the point where plaintiff was injured, the city was bound to keep the street in a reasonably safe condition was not erroneous.

THOMSON, J., dissenting.

Appeal by defendant from the Circuit Court of Cook county; the Hon. DAVID M. BROTHERS, Judge, presiding. Heard in the third division of this court for the first district at the March term, 1924. Affirmed. Opinion filed April 29, 1925.

FRANCIS X. BUSCH, Corporation Counsel, and JOHN J. KELLY, for appellant; DANIEL V. GALLERY, Assistant Corporation Counsel, of counsel.

Vose & Page, for appellee; Earl J. Walker and Allen J. Carter, of counsel.

Mr. Justice Taylor delivered the opinion of the court.

This is an appeal by the defendant, City of Chicago, from a judgment obtained in the circuit court by the plaintiff, Bertha Welch, for $18,000 for injuries alleged to have been received by her as the result of falling in the street, near the southeast corner of Madison and State Streets in the City of Chicago.

The accident happened on March 3, 1920. The suit was brought on March 2, 1921, and the declaration, consisting of two counts, was filed on March 7, 1921. The City of Chicago was then sole defendant.

On March 2, 1922, the Peoples Gas Light & Coke Company, the Commonwealth Edison Company, the Chicago City Railway Company, the Chicago Railways Company, the Chicago Telephone Company and the Illinois Bell Telephone Company were made additional parties defendant, and on the same day the plaintiff filed an amended declaration consisting of four counts. The first count of the amended declaration alleges that each of the defendants, except the City made an opening in Madison street, at its intersection with State street, and did the work so negligently that it caused a certain dangerous and unsafe hole to be and remain in said street, and that the defendant, the City of Chicago, authorized and permitted the making of the hole. It further alleges that the plaintiff, while passing over and crossing the place in question, and while using ordinary care for her own safety, tripped and fell into the hole and was severely and permanently injured.

The second count of the declaration sets up sections 2445, 2446 and 2448 of the Municipal Code of the City of Chicago. In that count it is alleged that

all of the defendants, except the City of Chicago, dug a hole in the corner of State and Madison streets and failed to put back, restore and replace, the soil or other material and that by reason of such failure a depression or opening of said street was left that was dangerous and unsafe to the public, which was contrary to the ordinances of the City of Chicago.

The third count alleges that the defendants, except the City of Chicago, made openings in the street at the point in question and permitted divers holes and depressions in the surface of the street after the work was done, and that it was done with the knowledge and consent of the City of Chicago and that the defendants negligently failed to guard or protect the hole.

The fourth count sets up sections 2543 and 3465 of the Municipal Code, the first of which prohibits contractors from opening up more than two blocks of street at one time and requires the earth to be repacked solidly after the work is done, and the second requires those who dig into the streets to erect a fence around the excavation. That count also alleges that all the defendants, except the City of Chicago, dug a hole at the point in question and failed to put a fence around it.

Each of the four counts alleges that on June 30, 1920, the plaintiff, by her attorneys, filed in the office of the city attorney, and also in the office of the city clerk, a statement in writing concerning the plaintiff and the accident pursuant to the statutory requirement.

On November 5, 1923, the Chicago Telephone Company, Illinois Bell Telephone Company, Commonwealth Edison Company, Chicago Railways Company, and Chicago City Railway Company, were dismissed out of the case. At the close of the evidence the jury found the Gas Company not guilty and brought in a verdict against the City in the sum of $18,000.

It is contended (1) that the original declaration did not sufficiently allege that a six months' statutory notice was given, and that when the amended declaration was filed, which was over a year after the accident, the plaintiff's cause of action did not exist; (2) that, even if the original declaration be considered good as to notice, the evidence does not prove the giving of such a notice as complies with the statute; (3) that the verdict is manifestly against the weight of the evidence; (4) that certain remarks of the trial judge violated the statute requiring written instructions; (5) that the verdict was excessive; and (6) that there was error in regard to certain instructions.

(1) As to the notice, as pleaded, and (2) as proved. The question of pleading arises by reason of the city having undertaken to plead the statute of limitations to the amended declaration, and a demurrer thereto having been sustained. It is contended that the original declaration did not contain sufficient averments that the six months' statutory notice to the City had been given; that on that subject it only stated conclusions, and, as the original declaration did not state a cause of action, the amended declaration filed March 2, 1922, two years after the accident, was too late and the cause of action was at an end. The original declaration, consisting of two counts, on the subject of notice, contained the following:

"The plaintiff alleges that prior to filing this, her suit, the plaintiff caused to be filed in the office of the City Attorney of the City of Chicago, and also in the office of the City Clerk of the City of Chicago, written notices of the injury herein described, said notices containing a statement of the hour, date and year on which the said accident occurred together with the location where the said accident occurred, and the name of the physician attending the plaintiff, after she received said injury."

Section 2, ch. 70 (Cahill's St. 1923, p. 1917), pro-

vides, in regard to suits for injuries against cities, that "Any person who is about to bring any action or suit at law in any court against any incorporated city, village or town for damages on account of any personal injury shall, within six months from the date of injury,   *   *   *   either by himself, agent or attorney, file in the office of the city attorney *   *   *   a statement in writing, signed by such person,   *   *   *   giving the name of the person to whom such cause of action has accrued, the name and residence of person injured, the date and about the hour of the accident, the place or location where such accident occurred, and the name and address of the attending physician, if any."

Section 3 [Cahill's St. ch. 70, ¶ 8] provides that if the notice is not filed as required by section 2, "then any such suit brought against any such city shall be dismissed and the person to whom any such cause of action accrued for any personal injury shall be forever barred from further suing."

This subject was considered elaborately by the Supreme Court in *Walters v. City of Ottawa*, 240 Ill. 259. In that case the original declaration contained no reference to any kind of a notice. The court said: "There is no allegation in either of the original counts having even remote reference to the notice,—nothing from which the giving of notice can be implied. It could not, therefore, if a verdict had been rendered on those counts, be presumed to have been proved and the declaration would not have been sufficient to support a judgment." In that case the court also said, when considering a declaration which states a cause of action, though defectively, and a declaration which does not state a cause of action: "If a declaration omits to allege any substantial fact which is essential to a right of action and which is not implied in or inferable from the finding of those which are alleged, a verdict for the plaintiff does not cure the

defect." In the instant case there was in the original declaration the allegation that a written notice had been served on the city attorney and the city clerk, so that if a verdict was subsequently given for the plaintiff, it may well be said, as arising by implication and inference, that the essential element of notice was involved and shown.

Counsel emphasize *Edmunds v. City of Chicago,* 203 Ill. App. 327. But in that case the declaration only alleged that the plaintiff by his attorney "served upon the city attorney and city clerk * * * in the office of said city attorney * * * a notice or statement." The words, "a notice," are by no means the equivalent of those used in the instant case. In the *Edmunds* case the court said, "the words are without import." And in a sense they were. But here the pleader said that the plaintiff had filed in the proper offices and with the proper parties, not merely a notice, but "written notices of the injury herein described." As a matter of pleading, it would seem to be a work of supererogation to allege more. More would have to be proved, but not necessarily pleaded. Because notice now is of the essence of the cause of action, it does not follow that all the many things, which may have gone into producing the ultimate fact of statutory notice, should be recited and described in detail in the declaration.

Moreover, the question whether the original declaration contains sufficient allegations in reference to the notice as to state a cause of action is not saved, because the plea of the statute of limitations filed by the defendant to the amended declaration was not a proper plea of the statute of limitations. It avers that the plaintiff ought not to have her action against the defendant, because the several supposed causes of action "in the said amended declaration mentioned did not, nor did any or either of them accrue to the plaintiff at any time within one year next before the

commencement of *this suit.*" The demurrer to this plea was properly sustained, because a proper plea of the statute of limitations should have averred that the cause of action in the amended declaration did not accrue to the plaintiff within one year preceding the filing of the amended declaration. *Wheeler v. Sanitary District of Chicago,* 270 Ill. 461; *Maegerlein v. City of Chicago,* 141 Ill. App. 414. The plea as filed by the defendant did not raise the question as to whether the amended declaration stated a new cause of action.

Counsel contend, also, that the notice that was actually proven on the trial was insufficient. We do not think so. That notice begins with the words, *Bertha Welch v. City of Chicago.* It then states, "Claim for money damages on account of personal injuries sustained by reason of negligence of the City of Chicago in maintenance of streets and sidewalks." It is addressed to the city attorney and city clerk of Chicago. The text of the notice is as follows:

"Pursuant to statute in such case made and provided you are hereby notified that a cause of action has accrued to Bertha Welch residing at 4019 N. Kilbourn Avenue, in the City of Chicago, County of Cook and State of Illinois, by reason of an accident occasioned by the negligence of the City of Chicago, on to-wit:—the 3rd day of March, 1920, at the hour of to-wit, 1:55 P. M. on said date. Said accident having occurred on, to-wit, the east side of State Street, near the south side of Madison Street, and at to-wit, the intersection of said streets in said City of Chicago, County of Cook and State of Illinois, and that the name and address of the attending physician for said Bertha Welch is Sara Janson, whose office address is 30 N. Michigan Avenue, and whose residence is 2606 N. Kedzie Blvd."

Below are the signed receipts of both city clerk and city attorney.

It is argued that the notice does not state that Bertha Welch was the injured person. It does say

that a cause of action accrued to her, and gives the name and address of her attending physician Sara Janson. What does that imply, if not that the plaintiff herself was the injured person? *Qui hæret in litera, hæret in cortice.* It is claimed that there were five omissions. An examination and analysis of the notice in conjunction with the statute show, in our judgment, a full compliance with the law. Counsel have cited, *Nicastro v. City of Chicago*, 175 Ill. App. 634; *Swenson v. City of Aurora*, 196 Ill. App. 83; *Ouimette v. City of Chicago*, 242 Ill. 501; *Condon v. City of Chicago*, 249 Ill. 596; *Edmunds v. City of Chicago*, 203 Ill. App. 327; *Reichert v. City of Chicago*, 169 Ill. App. 493. We do not find that any of them go so far as to hold or even intimate that the notice here was in substance or even in form defective.

(3)   One of the contentions made on behalf of the defendant is that the verdict is clearly contrary to the weight of the evidence. On Sunday, November 30, 1919, the Chicago Gas Light & Coke Company —hereinafter called the Gas Company—under a permit given to it by the City of Chicago, dug a hole about 4 feet deep near the southeast corner of the intersection of State and Madison streets in the City of Chicago, to reach a leak in a gas main. State street is a north and south street, and Madison an east and west street. The dimensions of the hole at the surface were 6 feet east and west, and 4 feet north and south, and the hole was located approximately about 19 feet north of the south line of Madison street, and 5 feet west of the east line of State street. The street crossing on the east side of the intersection of State and Madison streets runs from the southeast corner slightly northeasterly, owing to the fact that State street is broader at the north side of the intersection of the two streets than at the south side. There are two street car tracks in Madison street, one of which comes from the south on

State street and runs around the corner west on Madison street. The space between the street car tracks was paved with Belgian blocks, and practically all the space between the south rails of the street car track—which runs from State street into Madison street to the east—and the sidewalk on the south side of Madison street was paved with asphalt. Preparatory to digging the hole and reaching the gas main, the Gas Company first cut with an asphalt cutter a slab of asphalt approximately from one and one-half to two inches in thickness, and took it out and laid it aside. After that was taken up, there was then about 4 inches of concrete which was broken up by sledges and removed. Following that sufficient earth was removed from below to reach the gas main and make the repairs. After the repairs were made, 6 inches of dirt was first shoveled into the opening and tamped down, and then 6 inches more put in and tamped down until the hole was filled up to where the concrete had been. Then the concrete which had previously been broken up into chunks of various sizes was put back, and on that the asphalt.

The plaintiff was the only witness who testified as to her fall and the way in which she was injured. At the time of the injury she was between 28 and 29 years of age. She testified that on March 3, 1920, she went, taking her 19-months old child with her, to Carson, Pirie, Scott & Co.'s at the southeast corner of State and Madison streets, where she met her husband; that after meeting him and separating, the husband taking the child with him, she started to go west across State street; that after going 2 or 3 feet west of the sidewalk, she turned back and got to the sidewalk and then just as she had left the curb at a point a few feet east of the west line of the Carson, Pirie, Scott & Co. building and had gone north 2 or 3 steps, she suddenly stepped down into a hole; that she tried to right herself but could not; that her right foot

tripped on something and she was thrown violently to the ground, striking her hip; that she tried to get up but could not; that she was assisted to the curbstone; that from there she saw the hole into which she fell; that it was about 4 feet by 6, wider north and south than east and west; that the bottom of the hole was very rough, being of rocks and gravel; that she fell along the east edge of the hole, which was particularly rough; that the hole itself was irregular all over; that there were rough edges and jagged parts; that the asphalt on the east edge of the hole extended 4 or 5 inches west into the hole, and was very rough and jagged; that she stumbled on the edge of it, on the projection that extended out; that that is where her right foot tripped; that when she fell her right hand struck the north edge of the hole; that the hole was about 4 inches deep, and the surface at the bottom was very rough; that at the time she fell there was a crowd of about 50 people about her.

A policeman, Hayes, who had been stationed at that corner for 13 or 14 years, testified that he was standing 2 or 3 feet from the plaintiff when she fell; that it was the busiest time of the day; that when he first saw her she was lying down; that she was near the southwest corner, west of the crosswalk, about 2 or 3 feet north of the south curb of Madison street, and was going north; that he did not see her fall; that there was a depression where she fell, which had been made by an excavation that had taken place about 2 months or so before; that it was about 4 feet square; that it had been filled up afterwards and it was not smoothed off with asphalt; that it was in fairly good condition, but was rough and in the bottom of the depression there were rough stones; that it was a little rougher than other points in the street; that there was no asphalt on it.

On cross-examination he testified that the surface of the depression did not vary from the pavement

very much, but it was deeper in the center; that the depression in the center was about an inch and one-half to an inch and three-quarters; that at the edges of the hole it was nearly level; that it gradually sloped down to the center; that the depression had not been resurfaced, had no asphalt on it; that, aside from the fact that it had not been resurfaced, its condition was hardly noticeable from the rest of the pavement; that, on account of being filled with crushed stone and pieces of asphalt, it had been crushed down by the traffic, but was not quite as smooth as asphalt; that when the plaintiff fell she was lying in the depression.

One Adams, doorman for Carson, Pirie, Scott & Company for 14 years, testified that he did not see the plaintiff fall; that the depression at its center was about 2 inches down; that it had gradually worn down, by natural wear, that much from the edges; that its surface was crushed stone, and the rest of the street was asphalt; that 6 weeks before the accident he noticed the surface of the depression was a little below that of the asphalt; that whenever it rained, or the sprinkler came along, there was a little water in the depression.

One Fitzgerald, a city street inspector, called by the Gas Company, testified that he was present when the excavation was made; that he saw it the next day and made objection to the way in which the opening was filled. On cross-examination, he said that in the middle of January, afterwards, the pavement where the opening was made was in a fair condition; that it had gone down some from where it was when first opened, but it was almost up to the level of the pavement on each side and that he could see no depression there; that, as to the edges around, there was some depression about half an inch. He further said that the slab of asphalt that was removed was about three-quarters of an inch thick; that the asphalt cover-

ing the excavation was in general about half an inch below the surrounding pavement.

One Lavel, a foreman of the Gas Company and who had charge of the excavation, testified that they cut out with an asphalt cutter a piece of asphalt 4 feet by 5 feet and laid it on the side; that they then broke the concrete with sledge hammers, and laid the broken concrete aside; that after they got down to the gas main and repaired it they filled up the excavation, tamping every 6 inches on the way up; that they put on the broken concrete and then threw in the piece of asphalt, smoothed the seams and left the street in good condition.

Three other witnesses, Houlihan, Moran and Hogan, all employees of the Gas Company, workmen who took part in making the excavation and filling it up, testified and substantially corroborated the testimony of Lavel, the foreman.

From the foregoing, it is obvious that the plaintiff's case, as far as her motions when she fell are concerned, and as to just what physical obstacle, or condition, if any, caused her fall, rests entirely upon her own testimony, while the evidence of the condition of the *locus in quo* is contained in the testimony of a number of witnesses. There is no doubt but that her description of the physical condition of the east edge of the hole or depression varies somewhat from that given by Hayes, the crossing policeman, and Adams, the doorman. But both Hayes and Adams state that there was a depression, and Hayes, although he says it was in fairly good condition, further states that it was rough and that at the bottom of the depression there were rough stones, and that it was a little rougher than other points in the street. It is somewhat significant that Fitzgerald, a city street inspector who was present when the excavation was made, objected the day after as to the way in which the opening had been filled. He fur-

ther stated that in the middle of January, which was about 6 or 7 weeks after it had been filled, it was in a fair condition, but that it had gone down some from where it was when first opened, and that as to the edges there was some depression, about half an inch.

As to the law, there are many cases holding that a recovery may be had for injuries caused by somewhat similar defects; for example, a depression or hole caused by the removal of a cedar block in the street (*Beesley v. City of Chicago,* 170 Ill. App. 37); a depression 3 to 5 inches deep in the pavement (*Brown v. German Rock Asphalt Company,* 236 N. Y. 271, 140 N. E. 695); a depression 18 inches in diameter and 6 inches deep (*Birch v. Charleston Light, Heat & Power Company,* 113 Ill. App. 229); a hole 3 to 5 inches deep in a brick pavement at a street crossing (*Maxey v. City of East St. Louis,* 158 Ill. App. 627); an outer edge projecting stake in the sidewalk (*City of Taylorville v. Stafford,* 196 Ill. 288); a 5-inch hole where the end of a plank at a street crossing was depressed (*City of McLeansboro v. Trammel,* 109 Ill. App. 524). *Hamlet v. Inhabitants of Town of Watertown,* 248 Mass. 473, 143 N. E. 494.

There is no doubt but under the law the plaintiff was entitled to assume that the area of crosswalk on which she was going was in a reasonably safe condition for travel and that there was no special obligation upon her to look particularly at the surface of the street as she undertook to cross over. In *City of Chicago v. Babcock,* 143 Ill. 358, the court said:

"A person passing along a sidewalk in a city is required to use ordinary and reasonable care and diligence to avoid danger, but what is such ordinary and reasonable care depends upon the circumstances of each particular case, and is a question of fact for the jury. A pedestrian upon such sidewalk may ordinarily assume that the sidewalk is in a reasonably safe condition for travel. To hold that such person is absolutely bound to keep his or her eyes

constantly fixed on the sidewalk in a search for possible holes or other defects, would be to establish a manifestly unreasonable and wholly impracticable rule." *City of Chicago v. McCrudden*, 92 Ill. App. 257.

Ordinary care on the part of the City as it pertains to such an area as exists at State and Madison streets, which is traveled over each day by a vast multitude of pedestrians, and by thousands of vehicles—one of the busiest corners in the world—may be said to require a closer attention to physical conditions, and a somewhat smoother and safer surface in the street than is required where travel is sparse and each may not only look around, but actually see where he is going. Where the latter condition prevails, the pedestrian practically sees just about where he is to place each foot at each step, so that unevenness of one inch, two inches or three inches, may not be any source of danger whatever; but here, where the evidence shows that the pedestrian was practically in a solid crowd of people, moving across the street after the traffic had been stopped for that purpose and there could not reasonably be any opportunity to see any part of the street being walked upon, it is not difficult to understand, knowing how easily a pedestrian's equilibrium is disturbed by a slight and unexpected unevenness or obstacle, that her fall was precipitated by reason of something unexpected in the depression in question; in other words, by reason of the negligence of the City. Considering, therefore, the obligation of the city; that the crossing is one of the busiest known, and at the time in question was closely packed with people; that there was a depression in the street or crosswalk which was, according to some witnesses, rough and, according to the plaintiff, some inches deep and with a jagged edge on the east side, it is our judgment that, in view of the verdict of the jury who saw the plaintiff and the other witnesses, it would not be reasonable for

us to conclude that the verdict was against the manifest weight of the evidence.

(4) It is contended that in the course of the argument by counsel for the plaintiff, the trial judge addressed certain words to the jury which were in the nature of instructing the jury orally. When counsel for the City objected to a certain remark made to the jury in the argument by counsel for the plaintiff, and asked that it be stricken out and the jury instructed to disregard it, the trial judge said to the jury:

"Any statement to the jury contrary to the evidence would only weaken the argument of counsel, because the jury are instructed now that they will base their verdict, if any, upon the evidence introduced by the witnesses upon the stand, and the documentary evidence. Upon that alone you must find your verdict. The argument of counsel is for the purpose of analyzing the evidence and the law and aiding you in arriving at your conclusions, and so far as it aids you, accept it: if it does not aid you, don't accept it, no matter who the counsel are."

The statute (sections 72 and 73 Cahill's St. ch. 110, ¶¶ 72, 73) provides that "The court, in charging the jury, shall only instruct as to the law of the case," and "Hereafter no judge shall instruct the petit jury in any case, civil or criminal, unless such instructions are reduced to writing," and the Supreme Court has quite rigorously construed those provisions. In *Hefling v. Zandt*, 162 Ill. 162, it said: "Under our statute the circuit court has no authority to instruct the jury orally on any material issue in the case." *Casey v. Deinet*, 192 Ill. App. 252; *Hughes v. Eldorado Coal & Mining Co.*, 197 Ill. App. 259; *Aurora Trust & Savings Bank v. Fidler*, 200 Ill. App. 233. But, in *Ohio & M. Ry. Co. v. Wangelin*, 152 Ill. 138, where in the course of the argument before the jury one of the counsel made an improper remark, the Supreme Court said:

"The remark was improper. The court had the right to orally instruct the jury to disregard the statement, and should have complied with the request of opposite counsel made in that behalf. But the court seems to have been of opinion it could not so instruct orally, and so announced, and asked the mover of the instruction to reduce it to writing, but he declined so to do and took an exception. Meantime, counsel for appellee had withdrawn the remark, by explaining that he had made it through mistake and did not want the jury to take it as testimony. We are unable to see that this proceeding before the court and the jury affords sufficient cause for reversing the judgment."

It may well be that the trial judge went further than the situation justified, but, on the whole, and considering the instructions that were given at the close of the trial, we do not think that his remarks constitute such error as to require us for that reason to reverse the judgment. *Birmingham Fire Ins. Co. v. Pulver*, 126 Ill. 329.

(5) It is claimed for the defendant that the verdict and judgment are excessive. The plaintiff was married on August 18, 1913. Prior to that time she had been a school teacher, and subsequent thereto she did housework for the family. She had suffered no illness before the accident in question. Immediately following her injury on March 3, 1920, she was taken to the hospital, where, upon examination, it was found that she had suffered an oblique fracture of the neck of the femur of the right leg. An extension was then put on and then an ambulatory splint, which was on for about eight weeks. After being in the hospital for two weeks she was taken home, and was under the doctor's care until September, 1921; and after she got out of bed she was on crutches for about three weeks and then used a cane. Later, she was obliged to go back to crutches, which she used for several years thereafter. She testified

that she experiences pain in the hip of that leg all the time; that her right leg, the one that was injured, is about two inches shorter than the left leg, and is growing shorter all the time; that she is unable to do any work because of the pain in her hip; that if she puts her foot on the floor it hurts, and that she has to walk on her toes, and that she is unable to put enough weight on the injured leg to walk without crutches.

Dr. Pease, who examined the plaintiff just prior to the trial, testified that he found an atrophy of the head of the femur and some callous, and that certain X-ray pictures which were taken show not only a comminuted fracture of the head of the femur, but degeneration of the entire head of the femur.

In the argument for the City on this subject, it is merely stated dogmatically that the amount is excessive and indicates passion and prejudice against the City. We do not think so. Assuming as we must that up to the time of the injury she was a physically normal and well woman, and able to fulfill her domestic duties, and that since the injury and by reason of it she has become incapacitated so as to be unable to do her housework or even to walk without pain, and if she walks at all has to do so by the use of crutches, we do not feel justified in holding that the amount is unreasonable.

(6) As to the instructions. It is contended that instruction numbered 2 is based on the assumption, as a matter of fact, that the crosswalk was unsafe. It states first that a foot passenger has the right to presume that a street is reasonably safe for travel—unless there is notice to the contrary—and then, if the evidence showed that as she went over it she was using ordinary care, she had the right to presume it was reasonably safe, "unless it further appears from the evidence that the condition of said street and crosswalk was known to or discoverable by the

plaintiff in the exercise of ordinary care." All the latter means is that if the condition of a street is discoverable or known by the use of ordinary care, then there is no presumption that it is reasonably safe. In the instant case, on a densely crowded crossing, the condition of the surface, whatever it was, good or bad, was not necessarily discoverable by ordinary care; in such a crowd one would not be expected ordinarily to look down, but around in order to avoid a collision with foot passengers, or with vehicles on the street.

It is contended that instructions numbered 5 and 6 were erroneous. The use of the word "hole" is criticised. It might have been more apt to have used the word "depression," but, in a sense every hole is a depression and vice versa. The further contention that those instructions submitted the interpretation and the sufficiency of the evidence, as to notice to the jury, is untenable. Each of them on that subject submitted only matters of fact.

As to the instruction numbered 7, we think it stated the law accurately. The obligation therein described existed. It is the law that although the Gas Company did dig and fill the hole, yet the City was bound under the law to use reasonable care to keep the street in a reasonably safe condition. The instruction suggested nothing else.

Many other instructions are criticised and said to contain error. Ten instructions were given for the plaintiff, twenty for the City and thirteen for the Gas Company, and it would unreasonably extend this opinion to consider in detail all the criticisms that are argued. We have read and considered all the instructions, and taking them as a whole, as voluminous as they are, it is our judgment that they do not show any error sufficiently substantial to justify overriding the jury's verdict.

The judgment will be affirmed.

*Affirmed.*

O'CONNOR, P. J., concurs.

MR. JUSTICE THOMSON dissenting: I am unable to concur in the decision of this case. In my opinion the judgment and verdict for the plaintiff are against the manifest weight of the evidence. The description of the surface of the crosswalk where the plaintiff fell, as given by the plaintiff in her testimony, is not supported by the testimony of any other witness in the case, and differs very materially from the description of that surface as given by her own witnesses, one of whom was the crossing policeman who had been on duty at that point for years and had had occasion to observe this crosswalk daily, from the time the opening was made by the Gas Company to the time of the plaintiff's injury. The opportunity of the plaintiff for observing the conditions of the crossing where she fell was naturally very brief. As soon as she fell there was a crowd of people gathered about her,—she says at least fifty. When she gives the minute description she does of the surrounding conditions, all of which are favorable to her theory of a right to recover against the City, and all the other witnesses give a different description, which was not favorable to her position, as a plaintiff, and some of them had such greater opportunities for observing this locality than she did, I am of the opinion that she has not proven her case, in this respect, by a preponderance of the evidence and that the verdict supporting her in that regard is against the manifest weight of the evidence.

I am further of the opinion that the trial court erred materially in the matter of instructions to the jury. What the court said to the jury orally, during the course of the argument, was not merely directing them to disregard a remark made in the course of the argument, to which objection had been made and objection sustained, but it amounted to a substantial instruction and violated the rule that all such must be in writing. In my opinion it was further

inaccurate and misleading in telling the jury that so far as the argument of counsel "aids you, accept it, if it does not aid you, do not accept it."

On the theory that the evidence in this record is not such as to make it possible for this court to say that the verdict and judgment are against the manifest weight of the evidence, it must be apparent that the issue of fact presented to the jury, on the question of the negligence of the City, was exceedingly close and there was, therefore, occasion requiring the instructions to be clear and accurate. In my opinion, they were not. The trial court read to the jury 46 instructions. They make up nearly 24 printed pages of the abstract. In my opinion, the written instructions not only failed to give the jury a clear statement of the issues of fact presented for their decision, but they are of such a nature that the jury could have been left in nothing but confusion about the case. The second instruction, in my opinion, is open to the objection urged against it by counsel for the City, to the effect that it assumes that the condition of the crosswalk was unsafe. A number of the instructions submit questions involving the notice to the City, which the jury had no occasion to consider, and there were numerous references in the instructions to the effect of various ordinances and the duties thereby imposed on the City and on the Gas Company, and these instructions must have been particularly confusing to the jury, especially in view of the fact that in some particulars they are quite contradictory. In my opinion, the judgment should be reversed and the cause should be remanded for a new trial, at which the jury could determine the close issue of fact presented by the evidence, upon reasonably brief and clear instructions covering it.